Original

**FILED**

DEC 10 2021

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

Mark Gelazela

13805098

2512 Baltimore Pike

Hanover, PA 17331

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK GELAZELA, | Case No. 1:21-CV-01499-AWI-EPG |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR DAMAGES |
| vs. | JURY TRIAL DEMANDED |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## A. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331; <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971)

2. Institution where the violation occurred: Mendota Federal Correctional Institute.

## B. DEFENDANTS/PARTIES

1. UNITED STATES OF AMERICA may be served with process by service upon its registered agent at Office of the United States Attorney Civil Process Clerk, 2500 Tulare Street, Suite 4401 Fresno, CA 93721.

2. DR. THOMAS MOORE (hereinafter "Moore") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and the Doctor at Mendota FCI.

3.  WARDEN DOUGLAS WHITE (hereinafter "White") is an individual who was at all relevant times herein, a resident of the State of California, County of Fresno and the former Warden at Mendota FCI.

4.  CMC D. BLOCHER (hereinafter "Blocher") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and the CMC at Mendota FCI.

5.  ACTING WARDEN C. LEPE (hereinafter "Lepe") is an individual who was, at all relevant times herein, a resident of the State of California, County of Fresno and the former acting Warden at Mendota FCI.

6.  CASE MANAGER K. LEHMAN (hereinafter "Lehman") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and a case manager at Mendota FCI.

7.  CO AGODEN(sp?)/JOHN DOE 1, unknown correctional officer (hereinafter "John Doe 1") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and a Correctional Officer at FCI Mendota.

8.  MENDOTA FCI exists by virtue of the laws of the United States, and may be served with process by service upon its registered agent at Mendota FCI, P.O. Box 39, Mendota CA, 93640.

9.  BUREAU OF PRISONS exists by virtue of the laws of the United States, and may be served with process by service upon its registered agent at General Counsel, 320 First Street, NW, Washington, DC 20534.

## C. RELATED CASES

1.  MARK GELAZELA v. SANTA ANA PD et al. case number SA-CV-21-1126-JWH (DFM)

## Introduction

Your Honor, your Court's clerk split the Plaintiff's previous single original complaint filing (that was sent in one mailing) into three separate docket entries in error. Docket items 1, 3

2

1  and 4 were all mailed as a single filing and were to be docketed as one (put back together and in

2  proper order would be docket #3 on top of #4, then on top of #1), so the Court's difficulty in

3  deciphering the Plaintiff's original complaint is understandable.  In light of this, for this amended

4  complaint the Plaintiff is submitting this "longform" complaint with no attending "complaint

5  form", and in the interest of keeping this filing under 25 Pages, the Plaintiff is not resubmitting

6  all the evidentiary enclosures but will provide them during discovery and trial.  That being said,

7  please do not then dismiss this complaint due to "lack of factual evidence", as the Plaintiff is

8  simply trying to abide by the Court's request.

9       Regarding the Court's mention of this being several possible different actions, the

10  Plaintiff is filing this as one complaint because he has had it happen in the past that the Court

11  system eventually combined multiple actions relating the same issues into one action due to an

12  excessive burden on the court system, tax payer's money and the "court's calendar" (this is what

13  happened in the Plaintiff's criminal case), and moreover, the Plaintiff is indeed motioning that all

14  these Defendants be "joined in one action as defendants for: (A) any right to relief is asserted

15  against them jointly, severally, or in the alternative with respect to or arising out of the same

16  transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or

17  fact common to all defendants will arise in the action."); Coughlin v. Rogers, 130 F.3d 1348,

18  1350 (9th Cir. 1997) ("[T]he 'same transaction' requirement[] refers to similarity in the factual

19  background of a claim.").  Additionally, given the applicability under the FTCA for violation of

20  "Common Law Torts", all of the Defendants are liable as one entity in their official capacity as

21  transmuted to the "United States of America".

22       Given that the Plaintiff is proceeding "in forma pauperis", the Plaintiff humbly requests

23  under Rule 4 that the Court provides "service" for the attached summons to each Defendant.

24  Thank you for allowing the opportunity to amend this complaint, and should the Court determine

25  that there are additional items in this complaint that are amendable to allow for the maximum

26  possible chance of proceeding forward to hold the Defendants involved accountable for their

27  immoral, lawless and egregious actions, please graciously consider providing the Plaintiff an

28  additional opportunity to amend this complaint as well, Your Honor.

1      That not-withstanding, consider that pleadings of *pro se* plaintiffs "must be held to less

2  stringent standards than formal pleadings drafted by lawyers." Hebbe v. Pliler, 627 F.3d 338, 342

3  (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after

4  Iqbal), and in keeping with Karim-Panahi v. L.A. Police Dep't, 839 F.2d 621, 623 (9th Cir.

5  1988), please "construe the pleadings liberally and...afford [the] plaintiff the benefit of any

6  doubt" and hold this pro se complaint to a less stringent standard in not recommending dismissal

7  (Childress v. Northrop Corp., 618 F. Supp. 44, 55 A.F.T.R.2d (RIA) 690 (DC Dist Col 1985)),

8  and last, do not dismiss this claim because a pro se Plaintiff has failed to set forth a complete

9  legal theory supporting the claim alleged (see Johnson, 135 S. Ct. at 346 [noting that the Fed.

10  rules of Civ. Proc. "do not countenance dismissal of a complaint for imperfect statement of the

11  legal theory supporting the claim asserted"]).

12      The Plaintiff submits this complaint against the United States of America due to the

13  actions/negligence of the Bureau of Prisons (BOP), Mendota FCI, the named BOP and Mendota

14  FCI employees each in their official capacity, as described herein pursuant to "Bivens". The

15  Plaintiff requests that the United States' "sovereign immunity" be unequivocally waived **given its**

16  **violation of "common law torts"** per the enclosed legal citations of 28 U.S.C. §1346 Federal

17  Torts Claim Act (FTCA) and others (see also Murray v United States, 686 F .2d 1320, 50 A.F

18  .T.R.2d (RIA) 5612 (CAB) ND 1982) and (Sosa v. Alverez Machain, 542 U.S. 692, 700 (2004)).

19  The "United States, not responsible agency or employee, is proper party defendant" in "official

20  capacity" Federal Tort Claims Act suits.

21      The Plaintiff brings this claim against BOP/Mendota FCI employees Dr. Thomas Moore,

22  Warden Douglas White, Former acting Warden C. Lepe, CMC D. Blocher, Case Manager K.

23  Lehman and Officer Agoden (sp?)/John Doe 1, in their personal capacity under "Bivens" for

24  their specifically egregious actions/negligence as described herein in violation of the Plaintiff's

25  constitutional rights. They each through their "own individual actions, has violated the

26  Constitution" (Iqbal, 556 U.S. at 676).

27

28

4

1

## **FACTS**

2

3    1. The Plaintiff was fully exonerated in court of any wrongdoing in his criminal case, but

4    unfortunately, this exoneration occurred after the verdict so this did not prevent the Plaintiff from

5    being wrongfully incarcerated pending appeal for a new trial under "rule 33". The Plaintiff was

6    "fresh" off crutches after surgery and wearing a full metal leg-brace to lock his knee in place

7    when he was remanded into custody without warning. The parties involved in the related case

8    referenced above willfully re-damaged the Plaintiff's surgical repair when "indoctrinating" him.

9        Upon eventually arriving at Mendota FCI, the Plaintiff explained this to Moore, the only

10    physician at Mendota FCI, and Moore accused the Plaintiff of faking his injury. The Plaintiff is

11    a 50% service-connected, disabled Marine Corps veteran (at the time, now 70% due to

12    reevaluation after the further damage from the neglect and actions of the Defendants described

13    herein) who served honorably for ten years, so his knee issue is well documented, to include

14    being documented by those in the criminal administration system prior to the Plaintiff arriving at

15    Mendota FCI. Additionally, the Plaintiff arrived still in a complex, full length, metal knee brace,

16    as he was only six weeks post-surgery, and Plaintiff not only had the internal knee pictures from

17    the actual knee surgery with him but also had a copy of a letter from his world-renown, high-

18    profile surgeon describing the surgery and the Plaintiff's tender physical condition and that his

19    motion should be strictly limited, so it is unclear why Moore took the approach he did.

20        Over the course of the next year and a half, Moore willfully neglected to give any care to

21    the Plaintiff's knee. He refused to put him on limited duty status, ignored the Plaintiff's requests

22    to be sent out for an MRI to "reprove", per Moore's mandate, that the Plaintiff's knee was indeed

23    reinjured, and he refused to issue the necessary form for the Plaintiff to receive (via the mail) his

24    additional form-fitting, specialized knee brace that was supposed to replace his old knee brace

25    after three months per his surgeon's orders. Moore refused to issue even something as simple as

26    ibuprofen.

27        Because he refused, the Plaintiff had no choice but to send the brace in anyway but to

28    "unit team", hoping they would exercise clemency where Moore would not, but the brace (which

1   was sent by certified mail) was thrown in the trash by the mail room (Officer Goodrich, the mail

2   room officer, said that it was returned, but it was never received back, nor is there any record of

3   it being returned).

4          After literally dozens of Medical "cop-outs" requesting care and other administrative

5   actions, the Plaintiff did not receive an MRI and the results of the MRI until May and June of

6   2021 respectively, a year and a half after being incarcerated. The MRI and imaging results

7   showed that the Plaintiff's knee was indeed reinjured of course and, in addition to the fully torn

8   ACL and both meniscus being torn, it also showed there was/is a fluid cyst that formed, and it is

9   pressing on the nerve, making the Plaintiff loose feeling in his leg and foot at the risk of

10  amputation. This is the result of being denied medical treatment for more than a year-and-a-half.

11  The Plaintiff was refused "light duty" status by Moore until a year-and-two months after being

12  incarcerated, so for all that time the Plaintiff was required to perform regular duties that certainly

13  further damaged his knee which continued to deteriorate badly with lack of treatment and regular

14  "work status".

15         Post-MRI, the Plaintiff was ***STILL*** denied any care for his condition until SIS (prison

16  internal affairs) Lt. Ciscernos asked the Plaintiff if he had ever received any care post-MRI given

17  SIS's involvement with the Plaintiff's well-documented complaints regarding Moore and the fact

18  that the case had been elevated to Moore's "doctor superior" given his both willful and

19  neglectful behavior, and the Plaintiff informed him "no". Moore was finally forced to minimally

20  issue the Plaintiff anti-inflammatories and pain-killers but just a month and a half before release

21  (so a year and eight months after initial incaceration): too little, too late. Given the long delay,

22  the external doctor/radiologist that the Plaintiff was finally sent to noted that, were they even to

23  try and schedule a surgery at that point, the Plaintiff would been released by the time it would

24  occur. The Plaintiff is now permanently crippled and is set up to receive another complex

25  surgery on the "outside" due to the actions/inaction of the Defendants.

26         2. The Plaintiff has a long and virulent history of upper respiratory infections (Bronchitis,

27  walking pneumonia, meningitis, etc.) and has had two parts of his immune system removed and

28  so has a perpetually low white blood cell count. Lehman, flatly refused to even accept the

1  Plaintiff's BP-8, CARES Act release package, and Military and VA medical records until after

2  the Plaintiff complained to the Warden in documented email. The Plaintiff's requests for his

3  own Mendota medical records were ignored for months.

4      All these delays caused the Plaintiff to remain incarcerated, get COVID, and almost die (as

5  well as contribute to the further permanent crippling of his knee due to delaying medical

6  treatment even further that could have been received easily once released). Had Mrs. Lehman

7  not repeatedly refused his package, the Plaintiff would have been released to the safety of Home

8  Confinement before the massive COVID outbreak that occurred at the Mendota FCI camp on

9  August 25th, 2021. On either the 22nd or 23rd of August, Officer Galan admitted to an Inmate

10  (Inmate X) while they were both in close quarters in his office that both his children had tested

11  positive with COVID the previous day, and yet Officer Galan was at work. Two days later,

12  everyone started getting COVID, starting with Officer McGlaughlin, and the Plaintiff could see

13  that inmates were also starting to get sick. This happened at the same time as when the Plaintiff

14  was finally called to go to mandatory quarantine for 21 days prior to release under the CARES

15  Act.

16      The Plaintiff was put into his own cell in quarantine in a different building (C1) on the

17  26th of August, but on the 27th of August, a correctional officer, John Doe 1, who worked the

18  6am to 2pm shift on the same day bought Inmate X who was also being released under the

19  CARES ACT (the same Inmate X that Officer Galan had close contact with) into the Plaintiff's

20  cell. Both the Plaintiff and Inmate X protested to John Doe 1 against him putting them into a cell

21  together, as Inmate X had already been in quarantine for two days, and likewise the Plaintiff did

22  not feel comfortable being in the same cell as Inmate X given his contact with Officer Galan and

23  the outbreak. Inmate X had been tested for COVID in quarantine the day before he was forced

24  into the cell with the Plaintiff, but Inmate X had not received his results yet. After being forced

25  to "cell" together, the next day (August 27th), it was discovered that Inmate X's test came back

26  "positive" (he was eventually labeled "patient zero" for the outbreak), so they took both Inmate

27  X and the Plaintiff to medical isolation and there tested the Plaintiff. The Plaintiff was now

28  "positive"—shocker!

1    The Plaintiff became symptomatic on Sunday the 29th, with the COVID also inducing
2  "strep"; the Plaintiff almost died, could not eat food for three days, nor sleep; he lost a lot of
3  weight, and the pain was so intense in his throat that he would wake up every time he even
4  swallowed.  He wanted to go to the Hospital as he could also barely breathe (along with diarrhea,
5  nausea and all the other COVID symptoms), but dared not ask for fear that he would have to stay
6  at Mendota for an extended period and also given all the abuses there: that's very "telling".  The
7  Plaintiff (and everyone else) were also denied showers during this outbreak for days at a time
8  (sometimes as long as a week).

9    In addition to the needless and willful delays of the Plaintiff's justified release package
10  submissions, if protocol had been followed by John Doe 1, the Plaintiff would not have gotten
11  COVID, as he would have remained alone in quarantine, and Inmate X would not have been put
12  into the Plaintiff's cell until Inmate X's test results were verified as either positive or negative.
13  The Outbreak spread like wildfire of course; and as a result, Mendota staff bought the ENTIRE
14  CAMP over to the Quarantine unit (C1) were the Plaintiff was, so it then became one massive
15  "isolation unit".  When one adds this to the pain the Plaintiff was already in because of his knee
16  (the Plaintiff could never sleep more than an hour or two because of it), COVID became a truly
17  harrowing and damaging experience.

18    Along these lines, Lehman willfully, and for no good reason, delayed the Plaintiff's CARES
19  Act submission package, and if the Plaintiff had been released just a week sooner he could have
20  avoided the outbreak entirely (she caused a delay of at least 2 months as seen in email dates to
21  the Warden's office and the Warden's response almost two months later).

22    3. Acting Warden C. Lepe is the party who admitted to the Plaintiff via email that his first
23  request for compassionate release in June of 2020 was "lost", asking the Plaintiff to resubmit
24  three months later, which again, contributed to the Plaintiff contracting COVID and not being
25  able to get his knee surgery before permanent damage occurred.

26    4. Warden Douglas White was the official in charge at the time of most of the events
27  described herein, and the Plaintiff attempted to contact him several times through administrative
28  channels and was ignored or dismissed.  Related to this, Blocher was answering the Warden's

1    emails for him at one point (he admitted this to the Plaintiff directly), and Blocher also ignored,

2    dismissed or worked actively to derail the Plaintiff's requests both directly and through the

3    aforementioned emails.  It was not until the Plaintiff got other BOP employees to agree to testify

4    to the truth about some of the corruption that acting Warden M. Lejeune (White had retired at

5    that point) was "convinced" to force Lehman to allow the Plaintiff to finally submit his CARES

6    Act package and attending Military/VA medical records.  **It should not have taken over a year**

7    **for the Plaintiff's CARES Act package/"requests for release" to be even accepted for**

8    **review**; the damages caused are irreparable.

9        5. Someone at Mendota also fraudulently back-dated a made-up denial to one of the

10    Plaintiff's initial requests for compassionate release/Cares Act release to the Regional BOP, and

11    the Plaintiff has the evidence to prove this.  The three aforementioned Mendota staff members

12    have stated that they are willing to testify to this, as the Plaintiff was not the only one "fed up"

13    with the corruption at Mendota FCI.  The Plaintiff believes that Blocher is the guilty party and

14    will be subpoenaing additional paperwork for trial to show that he signed off on this backdating

15    officially. This caused further delay in the Plaintiff's release, resulting in more damages

16    physically, mentally and emotionally as outlined herein.

17        6. The Plaintiff was also denied the Eucharist for over a year and four months despite

18    repeated pleadings, and he is a practicing Catholic who had been accepted to become a Priest

19    before being wrongfully incarcerated for a crime he was fully exonerated of.

20        7. The Plaintiff's attempts to pursue legal action were knowingly subjugated at every

21    opportunity, as inmates were continually denied access to the "law library", whereby making it

22    impossible to construct any legal document with "citation".  Every time any one inmate would be

23    caught with "contraband", Mendota staff would punish **everyone** by taking away their access to

24    the legal law library (which was only available on computer), the chapel (they would close and

25    lock it-what depriving someone of their faith has anything to do with someone else being found

26    with contraband is anyone's guess), and also shut off the TV's which were the only source of

27    anti-recidivism activities ("ace courses" shown on TV) for application for Earned Time Credits

28    (ETC's) for application under the 1st step act; Mendota FCI has no other programing available

1  whatsoever.  **This is wildly unconstitutional to de facto extend an inmate's time in prison**
2  **because someone else he is not involved with violated policy**.  This occurred often and the
3  Plaintiff has documents showing his ignored complaints regarding this.
4       The staff was extremely uncooperative and deliberate in their denial of these rights: Lehman
5  even refused to sign something as simple an "in Forma Pauperis" form even though the Plaintiff
6  had shown her section  671.03(2) of the federal rules of criminal procedures which state, "if
7  permission is sought to proceed in forma pauperis, the petitioner must also have the warden or
8  other appropriate officer of the institution in which the petitioner is being held file a certificate
9  setting forth the amount of money or securities on deposit to the petitioner's credit in any account
10  in the institution".  As mentioned, she also refused to accept the Plaintiff's Cares act submission
11  and BP-8, so the Plaintiff had to wait months for his complaint to reach the Warden.
12  Additionally, the Plaintiff filed a 2241 in the Eastern District regarding these abuses, but they
13  ultimately advised him to submit under a civil complaint instead, as they stated the reliefs the
14  Plaintiff was requesting did not fall within the scope of a 2241.  However, in the interest of the
15  Plaintiff's safety and medical condition, the Court did issue an Order forwarding the Plaintiff's
16  issues for immediate attention back to the "litigation coordinator" at Mendota FCI (Court clerk
17  verified that it was sent and received) who promptly ignored Order in keeping with their
18  misconduct and subjugation of law process; this is all willful behavior by the staff at Mendota
19  FCI.
20       8.   The entire camp population was moved "across the street" to the Mendota medium
21  facility (unit C1) on April 22nd, 2020 in retribution for inmates exercising their administrative
22  remedies but under the "guise" of COVID.  In the C1 unit, the ice machine didn't work (ice was
23  helping subdue the Plaintiff's knee pain in the absence of medical care), the air conditioning
24  didn't work more than 50% of the time, and the power to the building kept shutting off entirely,
25  so the inmates just sat in what became dark sauna boxes in 120 degree desert heat because the
26  officers were tired of getting maintenance to come and reset the "breaker".  Several inmates
27  passed out, and the inmates were only offered showers three times a week on top of this and
28  were on lockdown 23 hours a day for no particular reason (none was given). This heat (lack of

1    ice) and dormancy swelled the Plaintiff's knee to monstrous proportions while making it

2    impossible to even try and "self-rehab". It is also unclear how giving inmates less showers per

3    week helps to stem the spread of COVID. The Plaintiff and the other inmates stayed in these

4    conditions for *three full months* during the hottest months of the year before returning to the

5    camp in August of 2020.

6        When Taft private prison closed, 160 inmates were transferred to Mendota during the first

7    height of the pandemic despite there being a "freeze" on inmate transfers, and **none of them**

8    were tested for COVID before they shipped or when they arrived, and they were released into the

9    general population at Mendota, needlessly exposing everyone. On that note, until the outbreak

10   mentioned above, not ONE SINGLE INMATE "in population" was ever tested for the virus at

11   Mendota camp despite their website saying that they were "testing inmates every day"; this

12   behavior is unconscionable.

13       What was most egregious was when the CDC finally came through to inspect Mendota

14   sometime in mid-August of 2020, and two days before they arrived, the staff at Mendota "put on

15   a show" that would have made "Cirque du Soliel" seem lame by comparison, suddenly putting up

16   signs about the virus and how to cough, adding tape to designate social distancing, separating

17   inmates in the dining hall by mandating that two chairs be left empty between each inmate, and

18   suddenly much, much more. Along with this (also two days before the inspection) the staff came

19   through with Acting Warden M. Lejeune and, all at once, took thirty inmates to the SHU for no

20   good reason just so that when the CDC came through the camp housing unit it would look like

21   there was social distancing for those who were left. One inmate (Jake Jorgensen), was taken to

22   the SHU solely for having nothing else other than a toilet paper roll on his desk (Mendota

23   regularly failed to provide the inmates with any cleaning/sanitization gear in the housing unit).

24       This was such an obvious ploy to mask Mendota's neglect of following CDC guidelines in

25   caring for inmates' health in the face of COVID, and this was shown clear when, on the day of

26   the inspection itself, the Mendota staff told the remaining inmates in the housing unit to "get

27   scarce" for the day and gave no guidance what this meant, so more than forty inmates literally

28   huddled by themselves (Plaintiff included) behind the scrap heap junk pile behind one of the

1  warehouses until the Inspectors and Mendota staff were gone, whereupon the inmates took it

2  upon themselves to return to the housing unit. This made it impossible to expose Mendota staff

3  violations/health concerns to the CDC staff. They conveniently bought the 30 inmates back from

4  the SHU a week later with no justification.

5      All of this is such obvious corruption, breech of protocol, safety and policy that it should

6  concern everyone involved your Honor, and if they trusted the inmates enough to go to an "out

7  of bounds" area on their own without any direction or supervision at all (given that there is

8  nothing physically keeping them at the camp except an unguarded six foot chain-link fence with

9  no "wire"), then there is no reason for the Mendota staff to work so deliberately at every step to

10  subjugate the Plaintiff and other's genuine release applications to home confinement given their

11  medical issues and increased susceptibility to the virus.

12      9. While on home confinement, the Plaintiff was informed in December of 2021 that his

13  request to get surgery on his knee through the VA would not be authorized by the BOP and that

14  he would have to wait until his full period of incarceration was over before he could see his

15  surgeon. Given the facts that the Plaintiff has related herein regarding his knee and its condition

16  (potential amputation in the absence of immediate attention), this denial by the BOP is beyond

17  cruel and unusual and is in keeping with their bad conduct.

18

19                          **CLAIMS FOR RELIEF**

20  **CLAIM I** Deliberate indifference to medical needs:

21      The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts"

22  above. The Plaintiff had the right to receive proper and timely medical care, and the Plaintiff

23  had the right to receive his VA appointed surgeon's proscribed medical device. Moore willfully

24  denied the Plaintiff the ability to receive this device by repeatedly willfully denying him the

25  proper form (Plaintiff has multiple written evidence of this to present at trial). The device was

26  sent anyway by certified mail and its reception by the Mendota Mail room is certifiable, and they

27  willfully discarded it. The lack of this device caused the Plaintiffs knee to continue to

28

1   deteriorate. The Plaintiff rights were violated under the 8th amendment, and these were also

2   violations of "Common Law Torts" and so also fall under the FTCA (see enclosed citations).

3         There was a "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d

4   1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Given the

5   Plaintiff's recent complex surgery, of which Moore was aware (it was documented in the

6   Plaintiffs BOP medical file), a "serious medical need" existed and Moore's "failure to treat a

7   prisoner's condition could result in further significant injury or the unnecessary and wanton

8   infliction of pain"

9         "The defendant's [Moore's] response to the need was deliberately indifferent." Id.

10  (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (citation and internal

11  quotations marks omitted), overruled on other grounds by WMX Technologies v. Miller, 104

12  F.3d 1133 (9th Cir. 1997) *(en banc)*, as he deliberately denied the Plaintiff the necessary form,

13  accused him of faking his injury several times, and literally shouted the Plaintiff out of his office

14  when the Plaintiff asked for the form a second time in person; completely unprompted, Moore

15  stated "go ahead and sue me, but you're not getting the form; we are done here!" If this isn't

16  "willful and deliberate" then it is hard to imagine what else is, and again the Plaintiff has a

17  plethora of written evidence to prove the "willful indifference" as well.

18        Moore knew of and disregarded "an *excessive risk to* inmate health and safety." Toguchi

19  v. Chung, 391 F.3d 13 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal

20  quotation marks omitted) and showed "(a) a purposeful act or failure to respond to a prisoner's

21  pain or possible medical need and (b) harm caused by the indifference," ~ 439 F.3d at 1096

22  (citation omitted). As mentioned, the eventual MRI showed that the Plaintiff was indeed very

23  injured, and was certainly in great pain, and this pain was expressed not only verbally but in

24  writing. To establish a difference of opinion rising to the level of deliberate indifference, a

25  "plaintiff must show that the course of treatment the doctors chose was medically unacceptable

26  under the circumstances." Jackson v. Mcintosh, 90 F.3d 330, 332 (9th Cir. 1996). Moore's

27  course of treatment (none) and not putting the Plaintiff on restricted duty, or allowing him to

28  receive his brace and denying him even anti-inflammatories and all of the aforementioned is

1   medically unacceptable by any reasonable standard, and again, the Plaintiff was and is a service-

2   connected, disabled veteran.  Moore's cold, callous and, at times, defiantly "hot" indifference

3   was a behavior he exercised not only with this Plaintiff but with others.  Despite SIS getting

4   involved and reprimanding Moore, Moore continued to willfully deny the Plaintiff all of the

5   aforementioned until about a month and a half before release (so over 1.5 years later).  To the

6   Court, the Plaintiff has enough evidence to support this claim to fill its own volume that he is

7   prepared to present in trial, so this claim is factual and cognizable.

8       Moore stated that he refused to give the Plaintiff any care until his medical conditions

9   would be "reproved" despite Moore already having the BOP's medical history for the Plaintiff

10  showing that the Plaintiff had the medical problems his did (and despite the surgery pictures and

11  surgeon letter), but in juxtapose, Moore then refused to send the Plaintiff out for an MRI despite

12  the Plaintiff's repeated requests.  After a year and a half and getting SIS involved, Moore finally

13  sent the Plaintiff out for an MRI but he annotated the incorrect knee on the authorization

14  paperwork, so the MRI had to be rescheduled for months later.  Moore documented the incorrect

15  knee on more than one occasion.  This is medical malpractice by any standard, and if he had not

16  been so indifferent, maybe he could have been able to annotate the proper knee.

17      The Plaintiff cannot express in words the amount of constant excruciating physical,

18  mental and emotional pain he was in the entire time he was at Mendota because of the lack of

19  care for his knee.  The Plaintiff is now unable to retain work presently due to the permanent

20  crippling, and his extremely deteriorated knee that is a result of going without any care for so

21  long will also further delay his entrance into the Priesthood, as he now needs another even more

22  complex surgery to try and lessen his permanent crippling.  The Plaintiff has a plethora of

23  evidence supporting this claim and everything referenced.  White, Lepe, Lehamn, Mendota FCI,

24  the BOP, Blocker and the United States are all party to this claim in their individual and official

25  capacities, as they all had knowledge of the issues and willfully chose not to act on them. till it

26  was too late.

27

28

**CLAIM II:** Violations of the *Americans With Disabilities Act ("ADA') and Rehabilitation Act*

The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts" above. "Title II of the ADA and§ 504 of the RA both prohibit discrimination on the basis of disability. The ADA applies only to public entities, whereas the RA proscribes discrimination in all federally-funded programs." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). "To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). "A plaintiff bringing suit under§ 504 [of the Rehabilitation Act] must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001). "The term "disability" means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1)(A)-(C).

The Plaintiff has a well-documented record of the serious impairment (50% disabled at the time, now 70% due to the damages incurred at Mendota) and it "substantially limits one or more major life activities". The surgeon who performed the surgery on the Plaintiff was appointed through the Veteran's Administration, a both a public and federally funded institution, and therefore the knee brace proscribed by the surgeon that was denied by Moore was a "benefit" he was "qualified to receive", and Moore's cantankerous, willful and deliberate denial was "intentional" and can be viewed as nothing less than denying the Plaintiff his "benefit" for no other reason than because he was disabled, thus qualifying as violations under both the aforementioned citations. "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant."

1   Duvall, 260 F.3d at 1138 (footnote omitted). Deliberate indifference is the appropriate standard
2   to apply in determining whether intentional discrimination occurred. Id. "Deliberate indifference
3   requires both knowledge that a harm to a federally protected right is substantially likely, and a
4   failure to act upon that likelihood." Id. at 1139. "[I]n order to meet the second element of the
5   deliberate indifference test, a failure to act must be the result of conduct that is more than
6   negligent, and involves an element of deliberateness." Id. Moore's deliberate behavior is truly
7   "cruel and unusual" and is also a violation of Common Law Torts and the Plaintiff rights under
8   the constitution.  White, Lepe, Lehamn, Mendota FCI, the BOP, Blocker and the United States
9   are all also party to this claim, as they all had knowledge of the issues and willfully chose not to
10  act on them.
11
12  **CLAIM III**: *Free Exercise of Religion*
13          The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts"
14  above.  The Supreme Court has repeatedly held that prisoners retain the protections of the First
15  Amendment, and although a prisoner's right to freely exercise his religion is "limited by
16  institutional objectives and by the loss of freedom concomitant with incarceration." Hartmann v.
17  California Dep't of Corr. & Rehab., 707 F.3d 1114, 1122 (9th Cir. 2013) (alteration in original)
18  (citations and internal quotation marks omitted), Mendota had no discernable institutional
19  objective in denying the Plaintiff the reception of the Eucharist from a year and five months.
20  Even when there was a lull in COVID and the local parishes opened back up, Mendota still failed
21  to provide access to the Eucharist for the faithful either by a Lay Eucharistic Minister or priest.
22  Even in the absence of a priest being able to come to Mendota and celebrate Mass, there was no
23  reason arrangements could not have been made for at least a Eucharistic minister to bring the
24  Eucharist to the faithful.
25          "'To ensure that courts afford appropriate deference to prison officials,' the Supreme
26  Court has directed that alleged infringements of prisoners' free exercise rights be 'judged under a
27  'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of
28  fundamental constitutional rights.'" Jones v. Williams, 791F.3d1023, 1032 (9th Cir. 2015)

1    (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)). "The challenged conduct 'is

2    valid if it is reasonably related to legitimate penological interests.'" Id. (quoting O'Lone, 482 U.S.

3    at 349). Regarding the afore citations, all "reasonable" excuses fail given that Mendota and its

4    staff failed to provide access to the Eucharist **for almost a year and a half**; no one can claim

5    otherwise in the face of such a long absence.  Keep in mind that the Plaintiff was at a "camp",

6    the most minimal security of all institutions, so neither can it be said that this lack of access to

7    the Eucharist was for "security reasons."

8         "To merit protection under the free exercise clause of the First Amendment, a religious

9    claim must satisfy two criteria. First, the claimant's proffered belief must be sincerely held;

10   Second, the claim must be rooted in religious belief, not in purely secular philosophical

11   concerns." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (alteration in original) (citations

12   and internal quotation marks omitted), supplemented, 65 F.3d 148 (9th Cir. 1995); see also

13   Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008) (noting the Supreme Court's disapproval

14   of the "centrality" test and finding that the "sincerity" test in Malik determines whether the Free

15   Exercise Clause applies).  After COVID was first lifted, there was no reason to continue to deny

16   the Plaintiff the Eucharist.  This was deliberate, and before the Plaintiff was wrongfully

17   incarcerated, he was a daily mass communicant, and he had been accepted and was in the process

18   of becoming a priest (Plaintiff has proof of this) and is now once again on his way to becoming a

19   Catholic priest, so his "belief is sincerely held".

20        Additionally, "[a] person asserting a free exercise claim must show that the government

21   action in question substantially burdens the person's practice of her religion." Jones, 791 F.3d at

22   1031. "A substantial burden ... place[s] more than an inconvenience on religious exercise; it must

23   have a tendency to coerce individuals into acting contrary to their religious beliefs or exert

24   substantial pressure on an adherent to modify his behavior and to violate his beliefs." Id. at 1031-

25   32 (alterations in original) (citation and internal quotation marks omitted).  The Eucharist is

26   central to the Catholic faith and the life of any Christian; in the words of Jesus, "Very truly, I tell

27   you, unless you eat the flesh of the Son of Man and drink his blood, you have no life in you." (Jn

28   6:53).  This is not symbolic for Catholics, we, through transubstantiation, are receiving the actual

1  body and blood of Christ, so to deny this for almost a year and a half was a "substantial burden"

2  and exerted "substantial pressure" on the Plaintiff "to modify his behavior and to violate his

3  beliefs": to wit, Catholics are required to receive the Eucharist, at a bare minimum, on the six

4  "Holy Days of Obligation" in the U.S. To fail in this is was to cause him to "violate his beliefs."

5  Given the Plaintiff's strongly held beliefs, this was extremely damaging, mentally, emotionally,

6  spiritually and, yes, even physically, "you shall have not life within you". White, Lepe, Lehman,

7  Mendota FCI, the BOP, Blocker and the United states are all party to this claim, as they all had

8  knowledge of the issues and willfully chose not to act despite the Plaintiff's repeated pleas.

9

10  **CLAIM IV**: *Access to Courts*

11        The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts"

12  above. Under the First and Fourteenth Amendments to the Constitution, inmates have a

13  "'fundamental constitutional right of access to the courts.'" Lewis v. Casey, 518 U.S. 343, 346

14  (1996) (quoting Bounds v. Smith, 430 U.S. 817 (1977)); Phillips v. Hust, 477 F.3d 1070, 1075

15  (9th Cir. 2007), overruled on other grounds by Hust v. Phillips, *555* U.S. 1150 (2009). The

16  Plaintiff suffered damages due to lack of access because it delayed the composure of his

17  compassionate release package and delayed his CARES act submission due to unavailability to

18  the law library (see Facts). Additionally, it caused a delay in the civil complaint filing in the

19  Related Case to the point that the Plaintiff had to submit for an extension, as he was not able to

20  make that Court's deadline for reply because of lack of access to the Law Library and the

21  delaying of the reception of the Plaintiff's legal mail. Lewis, 518 U.S. at 351-52; Vandelft v.

22  Moses, 31 F.3d 794, 798 (9th Cir. 1994). The Plaintiff was prejudiced with respect to both

23  contemplated and existing litigation, nor were any of these claims "frivolous". Lewis, 518 U.S.

24  at 349. The Plaintiff was denied the necessary tools to litigate a non-frivolous criminal appeal,

25  habeas petition, or civil rights action, Lewis, 518 U.S. at 353-55 & n.3; Christopher v. Harbury,

26  536 U.S. 403, 415 (2002). The Plaintiff was denied the ability to submit a proper rebuttal against

27  the Government in his main criminal appeal (no access to proper legal citations), and the denied

28  access also caused the plaintiff's rebuttal against the Government in his Compassionate Release

1    motion from reaching the District Court in time, so the judge ruled on the motion without the

2    Plaintiff's rebuttal (which was finally docketed after the judge's ruling).  The Plaintiff has

3    soooooo much evidence regarding all of these claims that are based in law that he will present in

4    discovery and at trial, so they are not "frivolous", and are "factual" and "cognizable". Allen v.

5    Sakai, 48 F.3d 1082, 1085 & n.12 (9th Cir. 1994). A claim "is frivolous where it lacks an

6    arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989), and even

7    despite that, the Ninth Circuit has emphasized that "[a] prisoner need not show, ex post, that he

8    would have been successful on the merits had his claim been considered. To hold otherwise

9    would permit prison officials to substitute their judgment for the courts' and to interfere with a

10   prisoner's right to court access on the chance that the prisoner's claim would eventually be

11   deemed frivolous." Allen, 48 F.3d at 1091 (footnote omitted). White, Lepe, Lehman, Mendota

12   FCI, the BOP, Blocker and the United States are all party to this claim, as they all had

13   knowledge of, and willfully participated in the denial of access and subjugation of legal actions.

14

15   **CLAIM V**: *Due Process*

16        The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts"

17   above.  The Due Process Clause of the Fourteenth Amendment protects prisoners from being

18   deprived of life, liberty, or property without due process of law. Wolff v. McDonnell, 418 U.S.

19   539, *556* (1974). The procedural guarantees of the Fifth and Fourteenth Amendments' Due

20   Process Clauses apply only when a constitutionally protected liberty or property interest is at

21   stake. Ingraham v. Wright, 430 U.S. 651, 672-73 (1977).  The Plaintiff's was denied due process

22   as set forth in this complaint.  White, Lepe, Lehman, Moore, Mendota FCI, the BOP, Blocker

23   and the United states are all party to this claim, as they all had knowledge of, and actively

24   participated in the denial of due process as outlined in this complaint.

25

26   **CLAIM VI**: *Threat to Safety*

27        The Plaintiff realleges and incorporates by reference paragraphs 1 through 9 in "Facts"

28   above.  The Plaintiff was continually subjected to unsanitary and dangerous living conditions as

1   outlined in this complaint, and as a result, the Plaintiff was needlessly exposed to COVID and his

2   knee was needlessly further crippled.  These are violations of both Common Law Torts under the

3   FTCA and the 8th Amendment. Nor can it be argued that any of this was done for penal reasons,

4   and if Mendota and its staff had provided more sanitary living conditions, maybe the outbreak

5   would not have occurred and inmates like William Waller, a really good an noble man who was

6   leading others to Christ, who perished from COVID just a week after the Plaintiff was finally

7   released, would still be alive.  The Plaintiff got extremely sick and almost died, and he was

8   offered no care for his COVID infection; *no one was*; the medical staff came and took the

9   inmate's pulse and temperature every couple of days.

10          His damages were physical, emotional and mental.  Per the citations noted previously, a

11  prison official may be held liable under the Eighth Amendment for acting with "deliberate

12  indifference" to inmate health or safety if he knows that inmates face a substantial risk of serious

13  harm and disregards that risk by failing to take reasonable measures to abate it.  The staff was

14  certainly aware that the power, AC, and ice were not working in the building C1 incident, and

15  given that Mendota is in the middle of the desert and it was the height of the summer, there is no

16  chance they can claim ignorance to the potential for harm.  Prison officials have a duty under the

17  Eighth Amendment to provide humane conditions of confinement. They must ensure that

18  inmates receive adequate food, clothing, shelter, and medical care.  The violations here are,

19  objectively, "sufficiently serious," Wilson v. Seiter, 501 U. S. 294, 298, and the Mendota staff

20  acted with "deliberate indifference" to inmate health or safety.  Under the Due Process Clause of

21  the Fourteenth Amendment (see Gordon v. Cty. of Orange, 888 F .3d 1118, 1124-25 (9th Cir, ,

22  2?18)) the Plaintiff alleges that all of "(i) the defendant[s] made an intentional decision with

23  respect to the conditions under which the plaintiff was confined; (ii) those conditions put the

24  plaintiff at substantial risk of suffering serious harm; (iii) the defendant[s] did not take

25  reasonable available measures to abate that risk, even though a reasonable official in the

26  circumstances would have appreciated the high degree of risk involved--making the

27  consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the

28  defendant caused the plaintiff's injuries."  These were also violations of "Common Law Torts"

and so also fall under the FTCA (see enclosed citations) ultimately holding the USA responsible regarding "official capacity". All Defendants are party to this claim, as they all had knowledge of, and participated in threats to safety as outlined herein.

## ADDITIONAL LEGAL REFERENCES

[542 US 752]

of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  § 1346(b)(1)

[542 US 706]

torts involving bodily harm is "the place where the harmful force takes effect upon the body" (emphasis in original)); ibid. (same principle for torts of fraud and torts involving harm to property).4

28 USCS § 1346(b) and (c) indicate that Congress intended ultimate monetary liability of United States for its torts to be determined in single action brought in federal court. Maltais v. United States, 439 F. Supp. 540, 25 Fed. R. Serv. 2d (Callaghan) 923 (N.D.N.Y. 1977).

The United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction. Such consent may not be implied, but must be unequivocally expressed. The Federal Tort Claims Act (FTCA ) waives the United States' immunity as to certain common law torts, 28 U.S.C.S. §§ 1346(b)(1), 2679(b), but not constitutional tort claims.

[3]  The FTCA "was designed primarily <*pg. 734> to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances."  Richards v United States, 369 US 1, 6, 7 L Ed 2d 492, 82 S Ct 585 (1962); see also 28 USC § 2674 [28 USCS § 2674]. The Act accordingly gives federal district courts jurisdiction over claims against the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  § 1346(b)(1).

The Federal Torts Claim Act (FTCA), 28 U.S.C.S. § 1346(b) et seq., vests the district courts with exclusive jurisdiction of civil actions on claims against the United States for money damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment. The FTCA states that any other statute authorizing a federal agency to sue and be sued in its own name does not authorize an action against the agency which is cognizable under the tort claims provision. Instead, a suit against the United States under the FTCA is the exclusive remedy for tort claims arising from the actions of government agencies or employees.  28 U.S.C.S. § 2679(a).

(b) (1) Subject to the provisions of chapter 171 of this title [28 USCS §§ 2671 et seq.], the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The Federal Tort Claims Act (FTCA) (28 USCS §§ 1346(b)(1), 2671 et seq.) removes the sovereign immunity of the United States for certain tort suits.

28 USCS § 1346(b) waives sovereign immunity of United States for claims resulting from negligent acts of employees only to extent that private person would be liable to claimant under law of place where act or omission occurs. Coe v. United States, 502 F. Supp. 881 (D. Or. 1980).

Federal Tort Claims Act is designed primarily to remove sovereign immunity of United States from suits in tort and, with certain specific exceptions, to render government liable in tort as private individual would be under like circumstances. Richards v. United States, 369 U.S. 1, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962)

Purpose of Federal Tort Claims Act is to compensate victims of negligence in conduct of governmental activities in circumstances like those in which private person would be liable and not to leave just treatment to caprice and legislative burden of individual private laws. Indian Towing Co. v. United States, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48, 1956 A.M.C. 27 (1955).

Government's waiver of sovereign immunity under Federal Tort Claims Act is not restricted to circumstances in which governmental bodies have traditionally been responsible for misconduct of their employees, but extends to novel and unprecedented forms of liability as well. United States v. Muniz, 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963).

Purpose of Federal Tort Claims Act was to waive government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability. Rayonier, Inc. v. United States, 352 U.S. 315, 77 S. Ct. 374, 1 L. Ed. 2d 354 (1957).

Purposes of Federal Tort Claims Act were to end injustice visited upon persons injured by torts of employees of United States, and left without remedy other than appeal to Congress, and to relieve Congress of burden of passing upon thousands of private claims presented to it. Aetna Casualty & Surety Co. v. United States, 170 F.2d 469 (2d Cir. 1948), aff'd, 338 U.S. 366, 70 S. Ct. 207, 94 L. Ed. 171 (1949).

Further, the Court may not dismiss a claim because a *pro se* plaintiff has failed to set forth a complete legal theory supporting the claim alleged. See Johnson, 135 S. Ct. at 346 (noting that the Fed. Rules of Civ. Proc. "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

28 USCS § 2680(h) waived immunity whenever investigative or law enforcement officer committed one of specified intentional torts, regardless of whether officer was engaged in investigative or law enforcement activity. Ignacio v. United States, 674 F.3d 252 (4th Cir. 2012).

## Claims § 12.3 – Federal Tort Claims Act - types

6a, 6b. The Federal Tort Claims Act (28 USCS §§ 1346(b)(1), 2671 et seq.), in authorizing some suits against the Federal Government, was passed with "garden-variety" torts in mind, such as torts involving bodily harm, fraud, harm to property, or negligence in the operation of vehicles.

The FTCA renders the United States liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 USC § 2674 [28 USCS § 2674]. The Act gives federal district courts "exclusive jurisdiction

United States, not responsible agency or employee, is proper party defendant in Federal Tort Claims Act suit. Galvin v. Occupational Safety & Health Admin., 860 F.2d 181, 12 Fed. R. Serv. 3d (Callaghan) 1498, 13 O.S.H. Cas. (BNA) 1960, 1988 O.S.H. Dec. (CCH) ¶28351 (5th Cir. 1988).

**CLOSING**

While at Mendota FCI, the Plaintiff exhausted all his administrative remedies by submitting a BP 8, 9, 10 and 11 up the BOP "chain of Command". Despite the top sheet of the BP paperwork only mentioning the "compassionate release" on its face, the administrative remedies specified clearly all of these claim issues except the recent December 2021 surgery denial. The Plaintiff also submitted an SF-95 to the regional BOP counsel (Administrative Claim No. TRT-WXR-2021-02085) regarding all these same issues; all were sent via certified mail (except the BP-8 which was handed directly to the "unit team), and the Plaintiff was given nothing but falsehoods, excuses and deferrals the entire way, and the fact that he is **_STILL_** being denied the opportunity to receive emergency surgery while on home confinement is exemplary of the BOP's egregious behavior.

Given all that has been provided herein, these claims are cognizable, factual and are set forth in a way that the Defendants can "defend itself effectively"; therefore the Plaintiff is due a trial by jury for relief. If it seems to the Court that this claim is copious, it is not because it is frivolous or "buckshot[ting]", it is because the abuses at Mendota are COPIUS, and again, the Plaintiff has **_volumes_** of evidence to back up his claims.

Were it to come in front of a jury, the Plaintiff has NO DOUBT that they will find in favor of the Plaintiff given the neglect and multiple, egregious, willful and wanton abuses by the almost wholly corrupt staff at Mendota FCI. These people are bad people your Honor, and they need to be held accountable.

And to your obvious thought, please remember that the Plaintiff was fully exonerated in court of any wrongdoing in his case (awaiting appeal due to the exoneration), so the Plaintiff is not a man of ill-character "pointing out a thorn in his neighbor's eye while ignoring the plank in his own." Being convicted of a crime the Plaintiff did not commit, he has a singular perspective: he only sees those who are doing injustices while on "the inside", for he had no "criminal guilt" to dwell on. Mendota staffs' corrupt, immoral and illegal behavior is in need of reprimand for the sake of those they needlessly abuse and neglect.

1    The plaintiff knows that the Court would not recommend dismissal for a legitimate
2    complaint by a pro se plaintiff just because he inadvertently failed to live up to the rigid standard
3    that falls outside of the purvey of a Pro Se Plaintiff, and please consider that the Plaintiff tried to
4    retain counsel for this case, and after going through over 30 attorneys' offices, the excuses were
5    VAST and VAGUE, because no one wants to take a case on "contingency" against the U.S.
6    Government who is known for needlessly dragging out civil cases to try and outlast the finances
7    of the Plaintiff's attorneys.

8

9                              **PRAYER FOR RELIEF**

10

11    The Plaintiff is demanding monetary damages of ten million U.S. Dollars
12    ($10,000,000.00) in reparation for all the actions mentioned in this complaint and the extreme
13    physical, mental, spiritual, and emotional injuries suffered due to the same. He is also asking for
14    the censure of the named parties involved (especially Moore and Lehman) and reimbursement of
15    legal fees to include, but not limited to, any fees required for the travel of witnesses. And any
16    further relief as this Court may determine to be just and necessary.
17    The Plaintiff believes he is entitled to a trial by jury and is claiming so per Rule 38(b) of
18    the Federal Rules of Civil Procedure.

19

20    I state that all of the forgoing statement are true and correct under penalty of perjury.

21

22    Oremus Pro Invicem,

23

24

25    Mark Gelazela

26    December 7th, 2021

27

28

# UNITED STATES DISTRICT COURT

for the

Eastern District of California ☑

|  |  |
|---|---|
| MARK GELAZELA | ) ) ) ) ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 1:21-CV-01499-AWI-EPG |
| UNITED STATES OF AMERICA, THOMAS MOORE, DOUGLAS WHITE, D. BLOCHER, C. LEPE, K. LEHMAN, AGODEN/JOHN DOE 1, MENDOTA FCI, BUREAU OF PRISONS | ) ) ) ) ) ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Mr. Mark Gelazela
2512 Baltimore Pike
Hanover, PA 17331

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                  *Signature of Clerk or Deputy Clerk*

Civil Action No. 1:21-CV-01499-AWI-EPG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                _____
                                                                 *Server's signature*

                                                          _____
                                                                 *Printed name and title*


                                                          _____
                                                                 *Server's address*

Additional information regarding attempted service, etc:

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MARK GELAZELA

**DEFENDANTS**
UNITED STATES OF AMERICA, et al.

**(b)** County of Residence of First Listed Plaintiff    Hanover
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
N/A

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
NOTE: Multiple Natures
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [x] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [x] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C § 1331; Bivens v. Six Unknown Named Federal Narcotics Agents, 403 U.S. 388 (1971)
Brief description of cause:
Violations of constitutional rights, common tort laws and the ADA and RA

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE    JWH (DFM)
DOCKET NUMBER    SA-CV-21-1126-JWH (DFM)

DATE
12/6/2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE